**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JUAN JOHNSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 02-1452 (RMC) |
| | ) Civil Action No. 04-936 (RMC) |
| DISTRICT OF COLUMBIA, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM OPINION**

On July 23, 2001, officers of the Major Narcotics Branch of the D.C. Metropolitan

Police Department ("MPD") conducted a "buy-bust operation," in which an undercover police

officer bought drugs from an individual, later identified to be Andre Clinton, in front of an apartment

building located at 3401 A Street, S.E., in the District of Columbia.  As recounted below, the police

chased Mr. Clinton and another individual, whom they believed to be an armed collaborator, into

the apartment building.  In the ensuing arrest of Mr. Clinton, the other individual was allegedly

stomped and kicked in the groin by Officer Jeffrey Bruce before he could identify himself as Juan

Johnson, an off-duty MPD officer and an innocent bystander.  Officer Johnson now sues the District

of Columbia for alleged use of excessive force/police brutality, assault and battery, and intentional

infliction of emotional distress.  He also sues Officer Bruce in his individual capacity under 42

U.S.C. § 1983.[1]  Defendants move for summary judgment: the District of Columbia asserts that

---

[1]  Officer Johnson initially filed two separate lawsuits.  On July 22, 2002, he filed a first
lawsuit against the District of Columbia and former MPD Assistant Chief Terrance Gainer alleging:
(1) excessive force/police brutality; (2) assault and battery; (3) deprivation of civil rights under 42
U.S.C. § 1983; (4) negligent hiring, training, and supervision; and (5) negligent and intentional
infliction of emotional distress. *Johnson v. Dist. of Columbia*, No. 02-1452 (RMC) ("*Johnson I*").

Officer Johnson's exclusive remedy against it is under the Police and Firefighters Retirement and Disability Act ("PFRDA"), D.C. Code § 5-701 *et seq.*, and that Officer Bruce avers that he is protected by qualified immunity.  The Court agrees and will grant the motion for summary judgment in its entirety.

## I.  BACKGROUND FACTS

On July 23, 2001, officers of the Major Narcotics Branch were conducting narcotics investigations in the area of 3401 A Street, S.E., Washington, D.C.  Defendants' Statement of Undisputed Material Facts ("Defs.' Facts") ¶ 1.[2]  The area is heavily infested with drugs.  Defs.' Facts ¶ 2.[3]  The officers conducted a "buy-bust operation" by which an undercover officer bought

---

On November 29, 2004, this Court dismissed all claims against former Assistant Chief Gainer and dismissed the § 1983 claim against the District. *Johnson I*, No. 02-1452 (D.D.C. Nov. 29, 2004). Therefore, the remaining claims in that suit are the common law claims against the District cited above.  On June 8, 2004, Officer Johnson filed a second lawsuit against the District and Officer Jeffrey Bruce. *Johnson v. Dist. of Columbia*, No. 04-936 (RMC) ("*Johnson II*").  By memorandum opinion filed July 20, 2005, the Court dismissed the excessive force/police brutality claim against both Defendants; again dismissed the § 1983 claim against the District; dismissed the § 1983 claim against Officer Bruce in his official capacity; dismissed the negligent hiring, training, and supervision claim against the District; and dismissed the negligent infliction of emotional distress claim against the District. *Johnson II*, 2005 U.S. Dist. LEXIS 16918 (D.D.C. 2005).  What remains from *Johnson II* are the § 1983 claim against Officer Bruce in his individual capacity and the negligent infliction of emotional distress claim against Officer Bruce.  In the most recent round of briefing, Officer Johnson has voluntarily dismissed all claims of negligent hiring, training, and supervision (already dismissed by the Court) and all claims of negligent infliction of emotional distress as to each of the Defendants. *See* Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Pltf.'s Opp.") at 11 n.1.  What remains at this point are the four claims referenced in the text: excessive force/police brutality against the District; assault and battery against the District; § 1983 deprivation of civil rights against Officer Bruce, in his individual capacity; and intentional infliction of emotional distress against the District.

[2]  The facts are taken from the Defendants' Statement of Undisputed Material Facts, unless disputed by Officer Johnson.

[3]  Officer Johnson does not dispute the accuracy of this statement and agrees that "they had a lot of drugs over there."  Defendants' Memorandum in Support of Motion for Summary Judgment

drugs from an individual, later identified as Andre Clinton, in front of an apartment building located at this address. Defs.' Facts ¶¶ 3-4. Officer Johnson lived in the apartment building at the time. Defs.' Facts ¶ 6; Pltf.'s Facts ¶ 6. Officer Bruce was on the arrest team, whose duty it was to stop parties involved in the drug transaction once the undercover officers gave a description of the people involved. Defs.' Facts ¶ 5; Pltf.'s Facts ¶ 5 ("This alleged fact is not material.").

After selling drugs to an undercover officer, Mr. Clinton ran from the police around to the back courtyard of the apartment building, where he encountered Officer Johnson. Defs.' Facts ¶ 7; Pltf.'s Facts ¶ 7. Mr. Clinton told Officer Johnson that he was running away from "stick-up boys" and Officer Johnson rushed him inside the back door of the building for their mutual safety. Defs.' Facts ¶¶ 7-8; Pltf.'s Facts ¶¶ 7-8. Once inside, Officer Johnson made sure that the door was shut and locked. Defs.' Facts ¶ 13; Pltf.'s Facts ¶ 13.

The arrest team officers broadcast on their radios that the individual who had just sold drugs to the undercover officer was running from police and that there was a second subject running with him towards the area where Officer Bruce was standing. Defs.' Facts ¶ 9; Pltf.'s Facts ¶ 9 (acknowledging the testimony but asserting that these facts are not material). Two additional broadcasts indicated that the second individual running with the drug dealer was wearing orange shorts and an orange hat and appeared to be armed because he was reaching for his waistband.[4] Defs.' Facts ¶¶ 10-11; Pltf.'s Facts ¶¶ 10-11 (acknowledging the testimony and asserting that the

---

("Defs.' Mem."), Ex. 2 at 2. He does assert that it is "not material to any of the issues that are present in this lawsuit." Plaintiff's Response to Defendants' Alleged Statement of Undisputed Material Facts ("Pltf.'s Facts") ¶ 2.

[4] Although not explicitly stated in the record, it does not appear that Officer Johnson was actually armed.

facts are not relevant or material).  Officer Bruce heard on his radio that the two individuals had gone

through the back door of the apartment building and had pulled the door shut.  Defs.' Facts ¶ 14;

Pltf.'s Facts ¶ 14.   Three officers, led by Officer Bruce, then ran to the front of the apartment

building, entered it, and started running up the steps inside.  Defs.' Facts ¶ 16; Pltf.'s Facts ¶ 16.

        Once inside the apartment building, Officer Johnson had instructed Mr. Clinton to

remain on the first floor while he went to his third-floor apartment to get the water Mr. Clinton had

requested.  Defs.' Mem., Ex. 3, Deposition of Juan Johnson ("Johnson Dep.") at 54, 59.  When

Officer Johnson emerged from his apartment with the water, however, Mr. Clinton was coming up

the steps to the third floor.  *Id.* at 59.  As he handed the water to Mr. Clinton on the stairs, Officer

Johnson heard a lot of running in the building and saw police officers coming up the stairs.  *Id.* at

59-60.  He immediately started to back up and then heard someone yelling "police, police."  *Id.* at

60.  The police had their guns drawn.  *Id.* at 62.  As he was backing away from Mr. Clinton, in the

direction of his open apartment door, Officer Johnson said, "I'm the police.  I'm the police."  *Id.* at

62.  The approaching police officers shouted out, "Put your hands up.  Put your hands up.  Let's see

your hands."  *Id.* at 63.  In Officer Johnson's words:

> I tried to give them the sign [that I am a police officer], was giving them the
> sign, saw that the sign wasn't being received.  So I kind of sensed that I
> could possibly get shot because I looked at the officer and I saw some fear.
> And I didn't want to get shot so I just turned towards my door, because my
> back was to my door.  So I just turned towards the door and fell inside my
> apartment onto the ground.
> . . .
> I [fell] inside the door. And then still saying, "I'm the police.  I'm the
> police," on the ground screaming, "I'm the police. I'm the police."  Then
> the officers came inside the building [sic] and started to assault me.

*Id.* at 64-65.  Officer Johnson was completely inside his apartment when he fell to the floor on his

stomach. *Id.* at 67 ("I mean, I turned around. I pushed the door and I fell onto the floor. So my whole body was completely in the entrance. It wasn't even hanging outside at all.").

It was Officer Bruce who came into Officer Johnson's apartment and it is Officer Bruce who is accused by Officer Johnson of kicking him and stomping him in the buttocks area and groin. Defs.' Facts ¶¶ 24-25; *see also* Johnson Dep. at 68 ("The officer came in and started kicking me. And he started stomping me. I am, like, 'What are you kicking me for? I'm the police. I'm the police. Why are you kicking me, why are you stomping me?'"). At the request of Officer Bruce, Officer Johnson showed his police identification and was recognized by other members of the arrest team. Johnson Dep. at 68-69; Pltf.'s Opp. at 3.

On July 24, 2001, Officer Johnson went to the Police and Fire Clinic, stating that he was injured as a result of his interaction with the police on July 23, 2001. He reported the following information on his MPD Injury or Illness Report:

> On July 23, 2001, I was assisting a citizen with a possible crime in progress. I was off-duty and in plainclothes at 3401 A Street, S.E. I did not recognize the citizen, but the citizen recognized me as a police officer. While assisting the citizen to safety, other MPD plainclothes officers responded to the scene. During the process of the investigation, which led to the arrest of the citizen, I was kicked in the groin by an unidentified MPD officer. I responded to the Police and Fire Clinic on July 24, 2001[,] and was seen by Dr. Faryom and placed in a sick leave status.

Defs.' Mem., Ex. 6.[5]

Officer Johnson's injury was approved by MPD as having occurred in the performance of duty ("POD") and he was compensated under the PFRDA. Defs.' Facts ¶ 28;

---

[5] "[T]he defendants are not disputing plaintiff's account of the force used for purposes of summary judgment." Defs.' Reply at 6. The Court, of course, construes the facts in the light most favorable to Officer Johnson and relies entirely on his description of the precise events that led to his claims.

Johnson Dep. at 107.  Officer Johnson returned to full duty in August 2001 but returned to sick leave

status shortly thereafter due to a psychological injury that he claimed was also a result of the July 23

encounter and also in the performance of duty.  *See* Defs.' Reply at 2, Ex. A, B.  However, on May

26, 2004, the Director of the Medical Services Division of MPD re-classified Officer Johnson's

psychological injury as non-performance of duty ("non-POD") because it did not meet the criteria

of MPD's "Stress Protocol."  Pltf.'s Opp., Ex. 2.

> In relevant part, the protocol establishes a compensable behavioral health
> or "stress claim" for injuries or illnesses that have been sustained in the
> performance of duty because of a critical incident.  Normal day-to-day
> stressors associated with the core functions of law enforcement that are part
> and parcel of normal police work, long hours, changes in tours of duty,
> conflict resolution, etc. would not normally be considered sufficient
> aggravating factors.
>
> . . . .
>
> As such, a "critical incident" leading to a POD classification is defined as:
>
>> 1.  A psychiatric injury or illness incurred while a member is directly
>> involved in taking police action in the performance of duty and such
>> police action results in death, or injury requiring urgent or emergency
>> medical intervention.
>>
>> 2.  A psychiatric injury or illness incurred by a member when he or she
>> has been a victim of an on-duty assault or other violent crime that
>> results in death or serious bodily injury.

*Id.*  Finding that Officer Johnson's psychological injury or illness did not meet either of these

criteria, the Medical Director recommended that it be reclassified non-POD.  *Id.*  Officer Johnson

appealed the re-classification of his psychological injury and, by memo dated December 28, 2004,

his appeal was denied.  *See* Pltf.'s Opp., Ex. 3.  Effective on that date, Officer Johnson was placed

on chargeable sick leave.  *Id.*  On an unknown date, he returned to work and is currently assigned

to the 5th District Station, where he works as a full-time police officer.  Pltf.'s Opp., Ex. 1.  Officer

Johnson has not put any records before the Court that would further elaborate upon the nature of his

alleged injuries.

## II.  LEGAL STANDARDS

### A.  Jurisdiction

Federal district courts have original jurisdiction over civil actions arising under

federal statutes.  28 U.S.C. § 1331.  Here, Plaintiff originally brought suit against both the District

and Officer Bruce under 42 U.S.C. § 1983.  As this case presents questions of federal law, this Court

has original jurisdiction.   Additionally, the Court has supplemental jurisdiction over Plaintiff's

common law claims against the Defendants, since the Court had original jurisdiction over Plaintiff's

42 U.S.C. § 1983 claims.  28 U.S.C. § 1367(a) ("[I]n any civil action of which the district courts

have original jurisdiction, the district courts shall have supplemental jurisdiction over all other

claims that are so related to claims in the action within such original jurisdiction that they form part

of the same case or controversy.").

### B.  Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be

granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see also Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir.

1995).  Moreover, summary judgment is properly granted against a party who "after adequate time

for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of

an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Greene*, 164 F.3d at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

### III.  ANALYSIS

PFRDA serves as a kind of workers' compensation program for police officers and firefighters injured in the line of duty in the District of Columbia. The District argues that PFRDA provides the exclusive remedy for Officer Johnson and bars his lawsuit. Officer Bruce argues that he is entitled to qualified immunity from suit. Officer Johnson contests both of these propositions.

### A.  PFRDA

Both parties agree that PFRDA is the exclusive remedy for police officers who are injured in the performance of duty. Pltf.'s Opp. at 5; Defs.' Mem. at 12; *see also Vargo v. Barry*, 667 A.2d 98, 101 (D.C. 1995); *Ray v. Dist. of Columbia*, 535 A.2d 868, 871 (D.C. 1987); *Lewis v. Dist. of Columbia*, 499 A.2d 911, 915 (D.C. 1985). The parties also do not dispute that a police

officer can be "off-duty" but still act "in the performance of duty" as a police officer.[6]  Defs. Mem. at 13-14; Pltf.'s Opp. at 7.  Where they part company is over Officer Johnson's arguments that PFRDA does not apply to intentional torts committed by co-workers and that it does not apply because Officer Johnson's psychological injury has been re-classified as non-POD.  Pltf.'s Opp. at 6-7.

Officer Johnson's first point finds its foundation in *Brown v. Jefferson*, 451 A.2d 74, 77 (D.C. 1982), which he asserts stands for the proposition that the PFRDA was "designed to mirror" the D.C. Workers' Compensation Act, D.C. Code § 32-501 *et seq*., as well as similar acts for other jurisdictions.  Pltf.'s Opp. at 6.  He then relies on Larson's Workmen's Compensation, Vol. 2, § 72.26, which cites thirty-four states that recognize an exception to the exclusivity of workers' compensation for intentional torts committed by a co-employee.  And finally Officer Johnson cites *Vargo v. Barry*, 667 A.2d 98 (D.C. 1995), which explained that workers' compensation "'make[s] the employer liable without fault if the employee's *accidental* injury or death falls within the scope of the Act, but as a quid pro quo for such automatic liability the Act provides the employee's exclusive remedy.'"  *Id.* at 101 n.5 (emphasis added).

This careful construct misperceives the state of the law in the District of Columbia.  *Brown v. Jefferson*, for instance, contains an important discussion of the philosophy behind worker compensation statutes generally but references only Supreme Court and D.C. caselaw.  451 A.2d at 77 ("Workmen's compensation statutes are generally viewed as remedial legislation intended to advance a social policy which favors limiting the liability of employers, while insuring that all

---

[6]  *See* D.C. Mun. Regs. Tit. 6A, § 200.4 ("Members of the force shall be held to be always on duty, although periodically relieved from the routine performance of it.").

injured employees receive adequate and certain compensation [expeditiously] and without regard

to fault."). It does not provide authority to interpret PFRDA in light of caselaw in other jurisdictions.

*Vargo v. Barry* continued the discussion by the D.C. Court of Appeals of the philosophical

underpinnings of worker compensation statutes but did not limit recovery to accidental injuries, as

Officer Johnson suggests. Pltf.'s Opp. at 6. The court in *Vargo v. Barry* noted,

> [T]he Disability Act was commonly understood to serve a purpose similar
> to that of a workers' compensation statute. . . . However, like the public
> policy trade-off implicit in workers' compensation statutes – substituting
> limited liability without fault for the right to sue in court – the Disability
> Act's remedies have been construed to be "the exclusive remed[ies] against
> the District of Columbia for uniformed personnel" injured in the
> performance of their duties.

667 A. 2d at 101 (quoting *Lewis v. District of Columbia*, 499 A.2d 911, 915 (D.C. 1985) (second

alteration in original)). Further, *Vargo v. Barry* instructed:

> Appellants spend a great deal of effort attempting to convince the court that
> the Disability Act is not "a workers' compensation statute." They raise
> several distinctions between the Disability Act and typical workers'
> compensation statutes, *such as the Disability Act's failure to allow an
> individual to maintain an action at law against the employer in the event a
> qualifying employee does not receive benefits.*

*Id.* at 101 n.4 (emphasis added). The court described the PFRDA as a "'comprehensive, and thus

exclusive,'" remedy, although not identical to private-sector workers' compensation statutes. *Id.*

(quoting *Lewis*, 499 A.2d at 913). As a result, the parallel between PFRDA and workers'

compensation laws in either this or other jurisdictions is imprecise at best and considerably weakens

Officer Johnson's argument.

      In fact, this Court has previously addressed – and rejected – the argument that the

District of Columbia can be held liable, outside the constraints of PFRDA, for the intentional torts

committed by one employee against another.  *See Estate of Phillips v. Dist. of Columbia*, 257 F.

Supp. 2d 69, 83-84 (D.D.C. 2003); *see also Feirson v. Dist. of Columbia*, 2005 U.S. Dist. LEXIS

35265 (D.D.C. 2005).  Officer Johnson seeks to escape the logic of these decisions by asserting that

his injury has been determined to be non-POD and, therefore, his right to sue is not limited by

PFRDA.  Upon examination, this argument fares no better than its predecessor.

       Officer Johnson claimed two kinds of injuries as a result of his encounter with the

arresting team on July 23, 2001: physical injuries to his groin area and, later, psychological injuries.

The former were treated medically and he was compensated with paid time off under PFRDA.  The

latter were ultimately determined to be non-POD because they did not meet the Stress Protocol

criteria.  Only the psychological injuries remain at issue here because PFRDA clearly covered and

compensated Officer Johnson for his physical injury.

       The argument advanced by Officer Johnson misunderstands the nature of the

comprehensive scheme and its policy trade-offs reflected in PFRDA.  In exchange for obviating the

necessity to prove fault, the District of Columbia has limited its liability to "uniformed" employees.

*Brown*, 451 A.2d at 77; *see also Feirson*, 2005 U.S. Dist. LEXIS 35265 at *5.  The *only* remedy

against the District for on-duty injuries of any kind lies in PFRDA.  *Lewis*, 499 A.2d at 915.  This

does not mean, however, that *all* injuries are necessarily compensable.  In 2003, the District adopted

a Stress Protocol to help it distinguish between the high-but-usual stress of an officer's regular job

and extraordinary-and-therefore-compensable stress.  Pltf.'s Opp., Ex. 2.  MPD determined that

Officer Johnson's psychological injury does not meet the criteria of the Stress Protocol.  He appealed

the decision to reclassify his POD status through the administrative process, without success.  Even

though this particular psychological injury is not compensable, PFRDA's comprehensive remedial

scheme continues to bar a lawsuit against the District.  Consequently, the remaining claims against the District of Columbia, for excessive force/police brutality, assault and battery, and intentional infliction of emotion distress, will be dismissed.

### B. Constitutional Claims

### 1. Fourth Amendment

Officer Johnson also sues Officer Bruce under § 1983, for deprivation of his civil rights.  Specifically, Officer Johnson claims that, during the altercation on July 23, 2001, Officer Bruce violated his Fourth Amendment right to be free from unlawful searches and seizures and his Fifth Amendment substantive due process rights.  Officer Bruce counters that he is entitled to qualified immunity for the actions forming the basis of Officer Johnson's § 1983 claim.

"When confronted with a claim of qualified immunity, a court must ask first the following question: 'Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?'" *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)); *see also Graham v. Connor*, 490 U.S. 386, 394 (1989) ("In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force.").  The Court in *Graham* noted that

> *all* claims that law enforcement officers have used excessive force … in the course of an arrest, investigatory stop, or other "seizure" of a free citizen must be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach.  Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.

*Graham,* 490 U.S. at 395; *see also* Def.'s Mem. at 15 n.2.  Therefore, this Court will analyze Officer

Johnson's allegations against Officer Bruce under the Fourth Amendment.

Having decided that the Fourth Amendment is the proper constitutional provision at

issue, the Court must consider the specific standards governing Officer Bruce's behavior, "rather

than some generalized 'excessive force' standard." *Graham*, 490 U.S. at 394 (citing *Tennessee v.

Garner*, 471 U.S. 1, 7-22 (1985)).  To begin with, "[o]ur Fourth Amendment jurisprudence has long

recognized that the right to make an arrest or investigatory stop necessarily carries with it the right

to use some degree of physical coercion or threat thereof to effect it." *Id.* at 396.  However, under

the Fourth Amendment, an officer's behavior must be "objectively reasonable" in light of the

particular situation the officer encountered.  *Id.* at 397.  "[U]se of force is contrary to the Fourth

Amendment if it is excessive under objective standards of reasonableness." *Saucier*, 533 U.S. at

202; *see also Harlow v. Fitzgerald*, 457 U.S. 800, 815-18 (1982) (holding that the subjective, good-

faith belief of a governmental official in the propriety of his actions is not relevant to the issue of

qualified immunity).  To assess whether Officer Bruce's actions were objectively reasonable, the

Court must consider the facts as would have been perceived by a reasonable officer on the scene, not

with the 20/20 vision that comes with knowledge of the full landscape of the facts.  *Id.* at 396.  The

Court must pay "careful attention to the facts and circumstances of each particular case, including

the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the

officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."

*Id.* (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)).

The circumstances facing Officer Bruce on the day in question are not in material

dispute and may be summarized as follows: The Major Narcotics Branch was conducting a buy-bust

operation near Officer Johnson's apartment building, which was located in an area heavily infested with drugs. After selling drugs to an undercover police officer, Andre Clinton ran to the rear of the apartment building. Narcotics officers on site observed Mr. Clinton speaking to Officer Johnson. The officers sent radio messages to warn the other members of the operation that there was a possible accomplice (Officer Johnson) and that this accomplice may be armed, because he appeared to be reaching for the waistband of his shorts. Mr. Clinton and Officer Johnson were seen briskly walking or running into the apartment building through a rear door, and the two made sure the rear door latched to prevent entry by others.

Officers entered the building in pursuit of Mr. Clinton and Officer Johnson. As they ran up three flights of stairs, they identified themselves as police and ordered Officer Johnson and Mr. Clinton to put their hands up in the air. Mr. Clinton put his hands up, but Officer Johnson backed up, turned around, and fell into the doorway of his apartment, lying on his stomach. At that point, Officer Bruce approached Officer Johnson and used force against a subject he believed to be a drug dealer who had a gun and who appeared to have attempted to flee inside the apartment.

Although this was an unfortunate incident, the Court finds that it was not objectively unreasonable for Officer Bruce to behave as he did, given the specific circumstances he faced. "'Not every push or shove, even if it may later seen unnecessary in the peace of a judge's chambers,' . . . violates the Fourth Amendment." *Id.* at 396 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). These events took place in a very short span of time, and Officer Bruce had to make instant decisions. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396-

97. Officer Bruce did not violate Officer Johnson's Fourth Amendment rights, and his actions were objectively reasonable.  The Court could end its inquiry here and grant Officer Bruce's motion for summary judgment because there was no Fourth Amendment violation.  *Saucier*, 533 U.S. at 201 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

### 2.  Qualified Immunity

However, even if the Court assumes that Officer Johnson's Fourth Amendment rights were violated under the facts alleged, Officer Bruce is still entitled to qualified immunity because his actions were not clearly unlawful at the time.  *Id.* at 205.  If a constitutional violation could be made out on the pleadings, viewing the facts in favor of Officer Johnson, then the Court must ask whether the constitutional right was clearly established.  *Id.* at 201.  "This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.*  The right that Officer Bruce is alleged to have violated "must have been 'clearly established' in a more particularized, and hence more relevant sense: The contours of the right must be sufficiently clear that a reasonable official would understand what he is doing violates that right."  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see also Saucier*, 533 U.S. at 202 (providing that the "relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted").

"Qualified immunity operates . . . to protect officers from the sometimes 'hazy border between excessive and acceptable force,' and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful."  *Saucier*, 533 U.S. at 206 (quoting *Priester v. Riviera Beach*, 208 F.3d 919, 926-27 (11th Cir. 2000), and noting that "reasonable mistakes can be made

as to the legal constraints on particular police conduct"); *see also Davis v. Scherer*, 468 U.S. 183, 190 (1984) (stating that "[e]ven defendants who violate constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard").   In deciding a motion for summary judgment, the Court may determine whether the law was clearly established at the time of the incident at issue, rather than sending the issue to the jury.  *Harlow*, 457 U.S. at 818.  "If the law at the time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation," and summary judgment based on qualified immunity is proper.  *Brosseau*, 543 U.S. at 198.

            While the Fourth Amendment has long barred police brutality, the undisputed facts – taking them from Officer Johnson's descriptions – fail to meet any prior case.  The parties do not point the Court to any cases relevant to the situation Officer Bruce confronted: whether, when alerted that a drug dealer was running with an apparent armed accomplice, any reasonable officer entering the apartment building and thundering up the stairs might well have feared for his safety from an armed suspect who failed to stand still with his arms up and who backed up and then turned away to escape into an apartment.   In the context of the specific facts of this case, it was not clearly established that Officer Bruce's conduct in restraining Officer Johnson was unlawful.

            Considering the facts in the light most favorable to Officer Johnson, Officer Bruce's actions were, at worst, "reasonable mistakes" made in the fear of the moment and not in violation of clearly established law.   Accordingly, Officer Bruce is shielded from liability by qualified immunity and he is entitled to summary judgment on Officer Johnson's § 1983 claim.

-16-

A separate order accompanies this memorandum opinion.


Date: August 10, 2006                                  _____/s/_____
                                                       ROSEMARY M. COLLYER
                                                       United States District Judge